**UNITED STATES of America, Appellant,**

v.

**John S. MELLINGER and Sweeney J. Doehring, As Executors of the Estate of Mary Edith Giles, Deceased, Appellees.**

**No. 15402.**

United States Court of Appeals Fifth Circuit.

Jan. 6, 1956.

Grant W. Wiprud, Atty., Dept. of Justice, Washington, D. C., H. Brian Hol-land, Asst. to the Atty. Gen., Ellis N. Slack, Sp. Asst. to the Atty. Gen., Malcolm R. Wilkey, U. S. Atty., Houston, Tex., Robert N. Anderson, Donald P. Hertzog, Attys., Dept. of Justice, Washington, D. C., for appellant.

J. H. Tallichet, Jr., J. L. Lockett, Lockett & Lockett, Houston, Tex., for appellees.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

We have here presented the question whether premiums paid by the taxpayer on life insurance policies on the life of her debtor which she held as collateral for a debt which had become worthless many years prior to the payments, are deductible as non-business expense deductions under Section 23(a) (2) of the Internal Revenue Code of 1939,[1] the insurance policies at no time having any cash surrender value.

The District Court, in a suit for refund of income tax illegally collected, brought against the United States, and there tried without a jury found in favor of the taxpayer, and the United States appeals.

The facts as stated in the appellant's brief were conceded by appellee. They are substantially undisputed and were the basis of findings of fact by the trial court.

In 1928 Mary Edith Giles made a loan in the amount of $25,000 to one

---

1. The applicable provisions of the Statute in question are as follows:

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

"(a) [As amended by Sec. 121(a), Revenue Act of 1942, c. 619, 56 Stat. 798] Expenses

"(1) Trade or business expenses.

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

\* \* \* \* \*

"(2) Non-trade or non-business expenses. In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. \* \* \*"

26 U.S.C.A., 1952 ed., § 23.

Edwin Larendon. The loan was secured by a deed of trust upon several pieces of property. As additional collateral Larendon assigned to the taxpayer ten separate policies of ordinary life insurance upon his life. Each was in the amount of $5,000. The loan was liquidated some two years later as a part of other business agreements between the taxpayer and Larendon, and the lien upon the real property was released. However, the policies of life insurance were not reassigned to the borrower by reason of the fact that the taxpayer claimed a lien for the amount of some $1,300 advanced to pay the premium thereon.

Shortly thereafter Larendon borrowed $4,000 from the taxpayer. A note for that amount dated May 30, 1930, was executed by him, payable to the order of the taxpayer on May 30, 1931, such note bearing interest from date at the rate of seven per cent per annum, payable semi-annually. Larendon also gave second liens upon several pieces of real estate to secure this indebtedness, and, while the written instruments do not reflect it, it was the understanding of the parties that the life insurance policies would likewise stand as security for this loan.

By the date of maturity of the $4,000 loan, Larendon had become a victim of the depression and was insolvent. He was unable to pay any part of the principal or interest. Foreclosure under prior mortgages rendered the taxpayer's second liens valueless. The only source from which the taxpayer could reasonably expect any recovery was the life insurance.

At the time that such policies were pledged with the taxpayer, Larendon had borrowed the maximum permissible amount by means of policy loans. As the cash surrender value was the same as the loan value, these policies did not have any present cash value over and above the amount of the loan.

By 1933, five of the policies of insurance were released and returned to Larendon. The remaining five were retained as collateral by the taxpayer.

Thereafter, until Larendon's death in 1952, at the age of eighty-six, each year the taxpayer paid the annual premium on each policy and the interest on the policy loan. Such payment was made in the following manner. On each premium paying date a small dividend accrued to the benefit of the policyholder. Likewise, the cash surrender and/or loan value increased each year. The total of these figures (amount of dividend, plus amount of increase in loan value) was deducted from the amount necessary to keep the policy in effect, namely, the annual premium plus interest on the prior policy loan. The taxpayer paid this balance in cash to the company. The net result of this practice was that the total permissible amount was always borrowed against the policies, and the taxpayer's out-of-pocket cost was kept at a minimum. The amounts of these cash payments made by the taxpayer to keep the policies in effect during the years beginning with 1942 and consecutively thereafter through 1948 amounted to between $1400 and $1700 per year.

John S. Mellinger, executor of the estate and manager of taxpayer's property during the taxable years, stated that he considered the payments dead losses.

While Larendon agreed, by means of renewals from time to time, to repay these advances, they did not constitute bona fide loans to him. Such advances were made by the taxpayer without any reasonable expectation that Larendon would repay them, and for the sole purpose of keeping alive the collateral, with the hope that, on his death, the insurance proceeds would be sufficient to repay the total outlay.

As time passed, and the amount expended by the taxpayer for premiums and interest on policy loans increased, a point was reached (in 1938) when, even in the event of Larendon's death, the taxpayer would not be able to recoup her entire outlay from the collateral. Putting it differently, in the event of the death of the insured, the proceeds of the policies ($25,000), from which the amount of the policy loans necessarily

was to be deducted, were less than the combined Larendon loan and the expense to which the taxpayer had been put in keeping the policies in effect.

At the time of Mr. Larendon's death taxpayer recovered $5,937.90 on the policies.

In her income tax returns for the taxable years here involved the taxpayer deducted as bad debts, among other items, the amounts which she paid out in keeping the insurance policies in effect. These deductions were disallowed by the Commissioner of Internal Revenue and income tax deficiencies, with interest, were assessed against the taxpayer, which amounts were paid to the Collector of Internal Revenue for the First District of Texas. The taxpayer timely filed claims for refund with respect to the deficiency assessments paid by her and interest thereon for each of the years 1943 through 1948, which were disallowed by the Commissioner, excepting the claim for refund for the year 1948 as to which more than six months had elapsed between the filing date of the claim and the bringing of this action. The taxpayer died on February 13, 1952, and thereafter this suit for refund was timely instituted by the executors of her estate. The Collector of Internal Revenue to whom the taxes involved were paid was no longer Collector when this action was filed and therefore it was brought against the United States of America.

In the District Court several issues were presented, all of which were decided against the taxpayer except the question of the taxpayer's right to deduct the amounts paid during the years involved to keep the above-mentioned insurance policies alive. The District Court held that these payments were not deductible as partial bad debt losses but were deductible by the taxpayer as non-business expenses under Section 23(a) (2) of the Internal Revenue Code of 1939. The court further stated that the taxpayer in making the payments was not lending additional monies to Larendon but that the payments were "volun-tarily made as a speculation on Larendon's longevity."

Appellee does not here contend that the payments are deductible as trade or business expenses under § 23(a) (1), supra, but argues that they are deductible, as held by the trial court, under § 23(a) (2) as a non-business expense. In order for them to be so deductible they must be ordinary and necessary and must be paid "for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income."

It seems too clear for argument that if we give to this language the meanings ordinarily attributed to the words, the payments do not satisfy the requirements of the statute. The payment of a life insurance premium on one's own life is as much a payment made for the production or collection of income or for the conservation or maintenance of property held for the production of income as is the payment by taxpayer here of the premiums in question.

Whatever may have been the situation before the time when both parties agree, and the court found, that the maker of the notes was hopelessly insolvent and there was no possibility that the taxpayer could ever recover an amount from the policy that would pay off the note and premiums already paid by her, from that time forward (and all payments here in controversy were made several years thereafter), every payment made by the taxpayer was in effect an investment by her on a speculative contract, which was no different from any payment made by the owner of a life insurance contract. It is, of course, true that taxpayer had an insurable interest in her debtor and she considered this to be a valuable right, because it led her to continue to speculate that he would die before she paid out enough in premiums to result in an additional loss to her. This is no different than it would have been had she made a similar speculation on the life expectancy of any other person in whose life she had an insurable interest. To hold that such premium

payments are deductible would be tantamount to holding that premiums on any life insurance policy are deductible. This, of course, cannot be done under the language and the clear intent of the statute.

The language of the statute, together with the legislative history of the section, make it clear that Section 23(a) (2) was added by the 1942 Act to remedy the inequitable situation, which arose in Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783, of an individual being taxed on investment income but being denied the right to deduct the cost of producing that income. Prior to the amendment such cost could be deducted only if the expenditure even though admittedly made in connection with the realization of current income, was made in "carrying on a trade or business." [2]

Appellee relies on the case of First National Bank & Trust Co. of Tulsa v. Jones, 10 Cir., 143 F.2d 652. This case was also cited by the District Court in its conclusions of law. The government seeks to distinguish this case, which held premium payments by a bank under somewhat similar circumstances deductible, on the ground that the Court of Appeals for the Tenth Circuit found the payments deductible as ordinary and necessary business expenses under Section 23(a) (1). It was not necessary for that court to find, as must be done here, that the expenditure met the further requirement that they be for the "production or collection of income, or for the management, conservation, or maintenance of property held for the production of income."

Whether this is a valid distinction or not, and the taxpayer says it is not, because it is pointed out that Regulation 111, § 29.23(a)–15 equates the term "expenses" as used in § 23(a) (2) to the term as used in 23(a) (1), nevertheless we are convinced that such an expenditure is not an expense under the applicable section. See Lykes v. United States, 343 U.S. 118, 72 S.Ct. 585, 96 L.Ed. 791.

The government makes the further argument that these payments are in the nature of capital expenditures rather than expenses. This is also in accord with the generally accepted accounting principle. Of course, capital expenditures are not deductible. Contrary to the argument put forth by appellee, each payment made by the taxpayer contributed to the capital amount that would ultimately be recoverable. It in fact created that fund as a source of ultimate payment. It was the annual premium payments which, under actuarial rules, provided the proceeds that become due on the insured's death. Such payments are certainly much more analogous to capital expenditures than to sums paid for the conservation or maintenance of property. The Tax Court case of Estate of Hall v. Commissioner of Internal Revenue, 17 T.C. 20, fully supports this view. See also Leslie v. Commissioner, 6 T.C. 488.

The government points out that this conclusion does not conflict with First National Bank & Trust Co. of Tulsa v. Jones, supra, in this respect because, so it argues, the line drawn between what is capital and what is expense is not so sharply drawn as to prevent the fact finder from placing similar items on either side of the line, if the particular accounting practice of the taxpayer justifies such treatment, citing in support of this proposition Commissioner of Internal Revenue v. Charleston National Bank, 4 Cir., 213 F.2d 45.

Again, we need not determine whether there is a basis for a valid distinction between the First National Bank case and the Hall case on the question whether this is a capital payment for we are satisfied that even if there is no distinction the result achieved in the Hall case is correct and the payment of premiums under the circumstances here present

2. For a discussion by the Supreme Court of the purpose of this amendment, see McDonald v. Commissioner, 323 U.S. 57, 61, 62, 65 S.Ct. 96, 89 L.Ed. 68.

does not constitute the payment of deductible expenses under § 23(a) (2).

The judgment is reversed and remanded for an entry of judgment in favor of the United States.

Reversed and remanded.